UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIO F. MEDEIROS III,<br><br>              Plaintiff,<br><br>      v.<br><br>SPRINGDALE BOROUGH,<br>PENNSYLVANIA,<br><br>              Defendant. | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. _____<br><br>Judge_____<br><br>**Electronic Filing**<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

### I. NATURE OF THE ACTION

1.      This is a civil action to correct discriminatory and other unlawful employment practices, and to make whole the Plaintiff, Julio F. Medeiros, III ("Plaintiff, ""Chief Medeiros," "Medeiros," or "the Chief").  Chief Medeiros was subjected to a pattern of discriminatory and retaliatory abuse, ridicule, insult, and surveillance which created a hostile work environment and caused him to suffer a disability, he was forced to work uncompensated overtime, and he was terminated because of his disability status, because he opposed an order to discriminate on the basis of race in the execution of his law enforcement duties, because he opposed other unlawful and unethical activity, because he exercised his Constitutional rights to petition the government and was denied due process, because he filed a workers' compensation claim, because he filed Charges of discrimination and a workers compensation claim against Springdale Borough, and because he otherwise sought to exercise his legally protected rights.

1

## II.  PARTIES

2.     Plaintiff, Julio F. Medeiros, III, is an adult  resident of Allegheny County, Pennsylvania.

3.     Defendant Springdale Borough, Pennsylvania ("Defendant," "Springdale," or, "the Borough") is a Borough pursuant to the Pennsylvania Borough Code.

4.     At all times relevant to the claims asserted herein, Springdale Brough Council had policymaking authority, including the right to hire and fire Police officers including the Chief.

5.     At all times relevant to the claims asserted herein, Springdale has continuously been a person, covered entity, and an employer within the meaning of 42 U.S.C. § 2000e, 42 U.S.C. §12111, 29 U.S.C. §701, and 43 P.S. § 954(a) and (b).

6.     At all times relevant to the claims asserted herein, the Springdale Police Department has been a recipient of federal funds.

## III. JURISDICTION AND VENUE

7.     Original federal question jurisdiction over this private suit to enforce Constitutional and civil rights under federal law, is conferred on this court by 28 U.S.C. §1331.  Supplemental jurisdiction over the related state statutory and Common Law claims  is conferred by 28 U.S.C. § 1367(a).

8.      Venue is properly laid in the U.S. District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. §1391(b), and in the Pittsburgh Division, pursuant to W.D.PA. L.R. 3.1., because the unlawful employment practices occurred in and around Allegheny County, Pennsylvania, where all parties reside, where Chief Medeiros worked, and where he suffered the unlawful employment practices and the resultant damages.

IV. CLAIMS

9. After an audit of the operations of the Springdale Police Department by former Police Chief Russ McKibben, a nationwide search, an initial telephone interview conducted by Chief McKibben, an interview by a panel of three Chiefs of Police, and a final interview by the Springdale Council, Chief Medeiros was hired by Springdale Borough as its Chief of Police in October, 2013.

10. Before Chief Medeiros was hired, in the office of, and  in the presence of, Harmar Township Police Chief Jason Dormratz, Springdale Council Member Mike Ziencik sought to influence him by offering him the interview questions before his second interview; Chief Medeiros declined and told Mr. Ziencik that he was fully prepared for the interview and did not need any help. Ziencik repeatedly insisted, and Chief Medeiros emphatically declined.

11. Council member John Molnar told Chief Medeiros that Mr. Molnar was going to be the next Mayor on more than one occasion and would "take good care of " him; once Kenneth Lloyd was elected mayor, Councilman Eugene Polsinelli warned Chief Medeiros that he "should have stuck with Mole" and that he had picked the wrong team.

12. Chief Medeiros and Springdale entered a written contract of employment (the "Springdale employment contract"), a copy of which is attached hereto and incorporated herein as **Exhibit 1[1].**

13. Pursuant to the Pennsylvania Borough Code and the Springdale employment contract, Chief Medeiros reported to the Mayor of Springdale, initially Eileen Miller, and later Kenneth Lloyd.

14. The Springdale employment contract expressly provides that Chief Medeiros may use compensatory time off ("comp time") for all hours worked beyond 40 hours per week, including for any time spent at the Council meetings in excess of thirty minutes.

15. Chief Medeiros's original executed copy of the employment contract was in his Springdale office when he was locked out while on medical leave, and thereafter prohibited from retrieving his personal documents and personal property; his office was entrusted to police officer Derek Dayoub, and Defendant is in sole possession of the original executed contract.

16. Though the Springdale employment contract references an attached [mutually] "agreeable" job description, no job description was appended to the contract at the time it was executed.

17. Springdale subsequently unilaterally imposed a job description on Chief Medeiros which described his duties as working as a patrol officer, and not primarily working as an administrator or supervisor.

---

[1] All attached Exhibits are incorporated herein by reference.

18. Springdale willfully misclassified Chief Medeiros as exempt under the Fair Labor Standards Act.

19. Chief Medeiros's wife and stepson are members of the Oglala Sioux Tribe.

20. It was raining when Chief Medeiros's stepson and wife were first introduced to Borough Council member Frank Forbes; Forbes asked her whether she had done a rain dance.

21. Because of Chief Medeiros's name, which is Portugese, Springdale Council members believed or concluded he was Hispanic, made negative comments to and about him and about Hispanics and Mexicans,  refused to call him by his proper name after being corrected, and even called him and referred to him as a "Spic" and a "Fucking Mexican."[2]

22. In December, 2013, Chief Medeiros was told by a Springdale Council member that his job was to "Keep the niggers on the other side of the river and crack their fucking heads if needed."

23. Chief Medeiros vigorously opposed this directive and stated he would conduct himself and the department in a professional and ethical manner, and emphatically refused to engage in any such discriminatory conduct in the performance of his duties.

---

[2] Chief Medeiros's first name, "Julio," is properly pronounced with a hard "j," like the masculine form of "Julia," however Springdale Council members Molnar and Polsinelli pronounced it "Hulio."

24. Council member Eugene Polsinelli threateningly told Chief Medeiros that he made a big mistake coming to Springdale, and mockingly said that he would buy Chief Medeiros a steak dinner if he lasted a year as Chief.

25. Mr. Polsinelli argued with Chief Medeiros and mocked him about the Chief's insistence upon following the law and proper police procedures to enforce the law, and told Chief Medeiros that "in the Valley" not everything is black and white.

26. After Chief Medeiros assumed control of the department and had Mr. Polsinelli's access to the computer record of the GPS reports on the locations of the Springdale Police Department cruisers removed, Mr. Polsinelli secretly contacted the company and regained access by establishing a Borough subaccount.

27. Thereafter, Chief Medeiros was subjected to a continuous course of conduct by Springdale, primarily through the actions of Mr. Polsinelli and Mr. Molnar in seeking to impose conditions and directives on, and otherwise interfering with, the Chief's work and his attempts to impose and enforce uniform policies, procedures, and discipline, and harassing the Chief, and seeking to undermine his authority and to foment dissent in the ranks, that combined and created a hostile work environment.

28. The Borough unsuccessfully attempted to terminate Chief Medeiros on false charges of intemperance and conduct unbecoming an officer, based on a false allegation that the Chief was overheard swearing during a closed-door telephone conversation in his office.

29. A Loudermill Hearing was conducted on February 24, 2014, and it was confirmed that the Chief had not been heard swearing.

30. Thereafter, Springdale, through its Borough Council members, continued regularly to take actions and to make comments harassing and denigrating Chief Medeiros, such as Council member Michael Ziencik telling Chief Medeiros on numerous occasions, "Stop being a little bitch," and "Take off your fucking skirt!"

31. Chief Medeiros observed police officer Derek Dayoub engaged in a pattern of habitual insubordinate conduct and conduct unbecoming an officer.

32. Chief Medeiros and the Mayor both recommended that Officer Dayoub not be extended an offer of permanent employment at the conclusion of his probationary period on the basis of the charges, and the Springdale Council initially approved.

32. Mr. Polsinelli objected to Officer Dayoub's termination at the end of his probationary period.

33. Springdale refused to terminate Officer Dayoub.

34. Mayor Lloyd and Chief Medeiros proposed a ten-day unpaid suspension, and held a Loudermill Hearing.

35. Springdale only imposed a verbal warning.

36. Officer Dayoub continued to be the subject of numerous official complaints by members of the public, his fellow officers and officers outside of the department, some of which involved allegations of misconduct which may have risen to the level of criminal conduct such as filing false police reports, and which were the subject of internal affairs investigations.

37. In April, 2015, Chief Medeiros drafted a letter addressed to the Springdale Solicitor, Craig Alexander, in which Medeiros reported and complained of the campaign of harassment and threats against him and against other police officers by Springdale Council members, and other matters of public concern, including, "inappropriate, unethical and even unlawful actions," and "biases," by the Springdale Borough Council, and the resultant "hostile work environment" in the Springdale Police Department. **Exhibit 2.**

38. Chief Medeiros gave copies of the letter to President Fry and Mayor Lloyd; Mayor Lloyd provided a copy to the Springdale Solicitor, Craig Alexander, who shared it with the rest of the Springdale Council members.

39. The contents of Chief Medeiros's April complaint letter were reported in the Valley News Dispatch newspaper.

40. Councilman Molnar responded to the report of the Chief's letter through the press, characterized the Chief's report and complaints as "implied threats," and claimed, "I will be seeking legal counsel."

41. In early May, 2015, Chief Medeiros called Springdale Solicitor Craig Alexander and informed him that he was considering filing a law suit against the Borough and naming Mr. Alexander personally as a defendant in the law suit.

42. Chief Medeiros suffered from the psychological harm and physical manifestations of the abusive work environment, including but not limited to panic attacks, rapid and irregular heartbeat, and sudden weight loss and gain, which substantially limited major life activities including his ability to concentrate, to sleep, to engage in vigorous physical activity, and to eat.

43. On July 17, 2015, Chief Medeiros filed a worker's compensation claim against Springdale, and he was ordered by his doctor immediately to either be hospitalized, or to take an extended sick leave from work, and to engage in physical exercise and relaxing activities.

44. Springdale's workers compensation panel doctor agreed with Chief Medeiros's doctor's diagnosis and recommended course of treatment.

45. On or about July 31, 2015, Chief Medeiros, though still on medical leave, went to his office to create the staffing schedule for the Police Department, in order to avoid the filing of any union grievances.

46. Chief Medeiros encountered Council member Zurisko at the Borough Building.

47. Mr. Zurisko informed Chief Medeiros that his medical leave had been the subject of a screaming match at the Executive session of the recent Council meeting, and that Council was questioning the Chief's "accountability" for the medical time off which his doctor had prescribed.

48. Chief Medeiros explained that he had provided a written notice to the Borough Manager, Kim McAfoose concerning his need for medical leave.

49. Mr. Zurisko said he was not told this by Ms. McAfoose and Chief Medeiros asked if Mr. Zurisko wanted to ask Ms. McAfoose in the Chief's presence, and he said yes.

50. Mr. Zurisko and Chief Medeiros went to meet with Ms. McAfoose in the old council chambers room, and Chief Medeiros asked her whether he had given her notice of his days off; she agreed that the Chief had done so, and said the balance of his available leave was indicated on his check (i.e., paystub).

51. Mr. Zurisko became upset and said this is not what Ms. McAfoose had told him; Ms. McAfoose replied that she was not the Chief's keeper and that the Chief reports the days off to her but she does not know his exact days off or where he was.

52. Mr. Zurisko heatedly asked Chief Medeiros whether the Mayor had given the Chief any comp days off; Chief Medeiros asked whether the Councilman was interrogating him.

53. Mr. Zurisko became enraged and said that the Chief is "a liability" being at work and directed Chief Medeiros to get a doctor's letter immediately and to give it to Kim McAfoose before returning to work.

54. Chief Medeiros went to see Springdale's workers compensation panel doctor again and asked to be released to return to work; the Borough's doctor refused.

55. On August 7, 2105, Chief Medeiros attended a charity golf tournament for a Police Chiefs' Association group, and observed Councilman Molnar, accompanied by his granddaughter, taking videotape and/or photographs of Chief Medeiros, laughing and pointing, which upset Chief Medeiros as well as many of those in attendance, including Judge David Sosovika, who also observed and commented on Mr. Molnar's intrusion.

56. On August 13, 2015, Council member Frank Forbes wrote two letters to Chief Medeiros on behalf of Springdale.

57. In one letter, he requested that Chief Medeiros "document in writing" all hours of his accumulated leave time taken and owed, by August 17, 2015. **Exhibit 3**.

58. Chief Medeiros responded by letter dated August 15, 2015, stating that he believed his July 29 pay stub accurately reflected his leave balances as of that date, and requested Springdale provide him access to his Borough office to review his records, and provide him his work cell phone records, in

order to provide a complete response as requested; Springdale never provided Chief Medeiros the records, or access to the records. **Exhibit 4.**

59. In Forbes's other letter dated August 13, 2015 Forbes stated that because Chief Medeiros had filed a workers compensation claim and due to the "extended nature of the leave," he was ordered to remain off work until he submitted a doctor's note releasing him to return to work "without restriction." **Exhibit 5.**

60. Chief Medeiros saw his doctor on August 13, who released Chief Medeiros to return to work on August 18, and Chief Medeiros supplied the requested release to the Borough.

61. Springdale further ordered the Chief to undergo a "medical and psychological examination" by a Springdale panel doctor.

62. Chief Medeiros was examined by Springdale's doctor on August 18, and released to return to work on August 19, 2015.

63. In an executive session on August 18, 2015, Springdale Council members Molnar and Polsinelli stated their intent to fire Chief Medeiros, but they expressed concern that the Borough would have to pay severance to Chief Medeiros under his employment contract, since they had no "good cause" to terminate him.

64. A majority of Council decided in executive session to hire a forensic investigator to review the police department records, as a way to try to concoct a reason to fire Chief Medeiros for good cause.

65. On August 18, 2015, Springdale voted to suspend Chief Medeiros with pay, supposedly "due to allegations of possible misappropriation of time or work hours," and also voted to authorize the hiring of a forensic accountant. **Exhibit 6.**

66. By letter dated August 19, 2015, Springdale informed Chief Medeiros of the actions taken at the August 18 meeting, informed him his leave with pay would continue "until such time as you are directed to return to work or formal charges and a notice of hearing are filed or some other action is taken by Borough Council," directed him to cooperate with the investigation, banned him from entering the police station or accessing computer files remotely, and concluded that if he resigned, the investigation would cease. **Exhibit 7.**

67. Open, pending internal affairs investigation files on the official complaints against Officer Dayoub were in Chief Medeiros's office when Springdale entrusted the Chief's office to Officer Dayoub and named him Acting Chief.

68. Ostensibly in response to the request in Chief Medeiros's August 15th letter, the Borough directed Chief Medeiros to come to his Borough Police Department office on August 25, 2015, but when he arrived, he was met by a number of Allegheny County Sheriff's deputies, the Police Chief of Frazier Township, Officer Derek Dayoub, and television news crews, and he was prohibited from accessing

the records in his Borough office reflecting his attendance, including his Borough email and cell phone, and his Day-Timer calendar, which was his personal property.

69. Chief Medeiros left empty-handed and humiliated, and the media reported that he had been "escorted from his office."

70. Mayor Kenneth Lloyd informed Springdale repeatedly, orally and in writing, in Council meetings, in executive session, publicly, and in statements to the media, that he had directed or authorized Chief Medeiros to take time off, including compensatory time for some of the many hours the Chief worked outside of his regular shifts. **Exhibits 8 and 9.**

71. On August 28, 2015, by and through Chief Medeiros's attorney, Springdale was given written notice of Chief Medeiros's legal claims of employment discrimination, and renewed his request to access the records of his work and leave hours in his work phone and work email; Springdale never responded. **Exhibit 10.**

72. Around the beginning of September 2015, Springdale hired Deluzio & Co., LLP, without a bid or other competitive process, reportedly at a cost of approximately Ten-Thousand Dollars ($10,000.00), purportedly to investigate the Borough's allegation that Chief Medeiros had misappropriated time or work hours.

73. The investigation conducted by Deluzio & Co., LLP, and CPA Jeffrey Anzovino ("Mr. Anzovino"), was not a "forensic investigation."

74. Mr. Anzovino was provided only certain documents and information selected by the Borough.

75. Mr. Anzovino analyzed only the information and documents the Borough provided, including interviews of Acting Chief Dayoub and Borough Secretary Kim McAfoose.

76. Mr. Anzovino did not request any additional specific information or documents, in order to determine when the Chief was working and when he was not working, or when he was on approved leave or not.

77. Mr. Anzovino testified under oath at the unemployment compensation referee's hearing in 2016, that he was not informed by the Borough, or otherwise aware, that Mayor Lloyd had stated publicly that he approved all leave the Chief had taken.

78. Mr. Anzovino did not interview Chief Medeiros as part of his investigation.

79. Mr. Anzovino did not interview Mayor Lloyd as part of his investigation.

80. Mr. Anzovino testified under oath at the unemployment compensation referee's hearing, that an examination of Chief Medeiros's Borough cell phone records and Borough email account would have provided evidence of dates and hours when the Chief had worked, and when he had been off on approved leave.

81. Mr. Anzovino  did not review Chief Medeiros's Borough email account as part of his investigation.

82. Mr. Anzovino  did not review Chief Medeiros's Borough cell phone data or records as part of his investigation.

83. On October 19, 2015, Chief Medeiros filed EEOC Charge No. 533-2016-00105 against Springdale and cross filed a Complaint with the Pennsylvania Human Relations Commission (PHRC) against Springdale and certain individual Council members. **Exhibit 11.**

84. Filing an EEOC Charge of discrimination against a public employer is a protected exercise of the right to petition the government for redress of grievances under First Amendment to the U.S. Constitution.[3]

85. On October 26, 2015, Chief Medeiros received a letter directing him to attend a Loudermill hearing on October 29, 2015, concerning the allegation that he had misappropriated leave, along with a copy of a "preliminary report" dated October 17, 2015 from Deluzio & Co., LLC; Chief Medeiros responded promptly through legal counsel, renewing his request to access his email and cell phone records, disputed the allegations and reminded Springdale that the Mayor had authorized his leave, and warned of an FLSA claim for uncompensated overtime. **Exhibit 12.**

---

[3] See: <u>Anderson v. Davila</u>, 125 F.3d 148, 161-162 (3d Cir. 1997).

86. The Loudermill hearing was attended by Chief Medeiros, Mayor Lloyd, and Council members Gene Polsinelli, John Molnar, and Council President Jason Fry.

87. On October 29, 2015, at a scheduled Council meeting for budgetary purposes immediately following the Loudermill hearing, a motion to terminate Chief Medeiros based on the allegation that he had misappropriated leave was made by Mr. Molnar, and seconded by Mr. Forbes.

88. The Motion to terminate Chief Medeiros was defeated by a vote of 4-3, with Mr. Molnar, Mr. Polsinelli, and Mr. Forbes voting in favor of termination.

89. At the same meeting, Springdale voted to change Chief Medeiros's status from a paid suspension to an unpaid suspension, until he was examined and released to return to work by his physician and his psychiatrist, and passed a drug screen.

90. Springdale did not impose any deadline by which the Chief had to be tested and/or examined and released, or any other conditions on Chief Medeiros's continued employment while on unpaid leave.

91. At the same meeting, Springdale voted to authorize the solicitor to issue a subpoena to the Chief for him to produce additional records which supported the Chief's explanation of his leave usage, which consisted primarily of the email and cell phone records which were in the Borough's exclusive possession; Chief Medeiros again asked for access to the records in Springdale's possession and objected to the adverse action of placing him on unpaid leave **Exhibit 13.**

92. Springdale did not send Chief Medeiros a letter describing the actions it had voted to require him to take before returning to work from his then-unpaid suspension until November 6, 2015.

93. The subpoena for records was purportedly sent pursuant to 8 Pa. C.S.A. §1014, which authorizes Borough councils to compel the attendance of witnesses, accompanied by the production of books, papers, or other evidence, at any meeting of the council or committee of the council.

94. The subpoena was defective because it sought to command the production of documents on a day when no council meeting was scheduled, and on a day when council knew the Chief would be out of the state.

95. Chief Medeiros, through his legal counsel, asserted legal objections and practical limitations to the defective subpoena, and offered to comply voluntarily upon his return from his travel, to the extent any responsive documents were in his possession. **Exhibit 14.**

96. Though the Borough failed to provide any written or oral directive to Chief Medeiros until November 6, he had acted immediately to comply with what he understood as the Borough's conditions precedent to his reinstatement to active duty.

97. The Chief submitted to a drug screen on November 2, 2015 (which he passed), and was examined by his physician on November 3, 2015.

98. Chief Medeiros's physician refused to release him to return to work until he was seen and released by his treating psychiatrist, which appointment was scheduled for December 3, 2015, and recommended that he go forward with his annual trip out of state the following week, consistent with his previous prescription of physical activity and relaxation. This information was promptly provided to the Borough through its solicitor.

99. Despite this knowledge, late on November 6, 2015, Springdale notified Chief Medeiros it had scheduled additional defense physical and psychiatric medical exams with its own panel doctors for the following week, but agreed to cancel them in light of Chief Medeiros's explanation that he could not return to work until at least December, and that he would not be in town; Chief Medeiros also had purchased a plane ticket and offered to fly back to take the exams if the Borough insisted, but it did not insist. **Exhibit 15**.

100. Though Chief Medeiros was officially on unpaid medical leave, and was medically prohibited form returning to work at the time, he also requested the Mayor's permission to travel out of town, which the Mayor approved. **Exhibit 16.**

101. The Borough, through Solicitor Alexander, advised Chief Medeiros that he could take the remaining medical exam upon his return. See: Exhibit 15.

102. Springdale Borough Council meetings are audio recorded.

103. On November 17, 2015, Springdale terminated Chief Medeiros based on a motion by Springdale Borough Council member John Molnar. **Exhibit 17 (pp. 9-10).**

104. Before making the motion to terminate Chief Medeiros on November 17, 2015, Mr. Molnar asked Borough Solicitor Craig Alexander to correct him if he said anything "out of line."

105. Though Mr. Molnar was in the failed minority in voting to fire the Chief for misappropriation of leave at the October 29th meeting, on November 17, 2015, he again cited the false allegation that the Chief had done something wrong concerning his compensatory and other leave as one of the reasons he moved to fire Chief Medeiros, despite Mr. Molnar's knowledge that Mayor Lloyd repeatedly stated he had authorized any leave the Chief had taken, and that a vote to terminate Chief Medeiros on that basis had already failed.

106. Mr. Molnar further falsely alleged that Chief Medeiros had been insubordinate by allegedly not complying with Council's order that the Chief would be on unpaid leave until he passed a drug test, and got medical releases to return to work.

107. Solicitor Alexander corrected Mr. Molnar concerning the history of communications between the Chief's attorney and Solicitor Alexander regarding the Chief's completed and planned compliance with the Borough's medical examination conditions precedent to his reinstatement to active duty.

108. Mr. Molnar also falsely alleged that Chief Medeiros had been insubordinate by allegedly refusing to comply with Council's defective subpoena for records reflecting his hours and days worked.

109. The Borough did not provide Chief Medeiros with a Loudermill notice or any notice or hearing of any kind concerning the new charges that he allegedly improperly failed to submit to drug testing and medical exams, or that he failed to comply with the Borough's subpoena, and thereby denied him due process before depriving him of his job.

110. Mr. Molnar's stated reasons for proposing Chief Medeiros's termination included the fact that he had filed a workers compensation claim.

111. Terminating Chief Medeiros for asserting a workers compensation claim is in violation of the clear and specific public policy of the Commonwealth of Pennsylvania.

112. Mr. Molnar's stated reasons for proposing Chief Medeiros's termination included the fact that he had filed an EEOC Charge of discrimination in employment, which Mr. Molnar referred to as a "law suit."

113. Terminating a worker for asserting a discrimination claim under Title VII, the Pennsylvania Human Relations Act, the Americans With Disabilities Act, and/or the Rehabilitation Act violates the retaliation provisions of each respective statute.

114. After Mr. Molnar made a motion to terminate the Chief for these reasons, Solicitor Alexander interrupted and specifically advised Mr. Molnar that no action could be taken against Chief Medeiros because he had exercised his rights, explaining, "I don't think this council can consider at all any action the chief has taken with regard to anything that he has filed...you have mentioned that he had a lawsuit or something like that...Nothing we do can be predicated on that."

115. Mr. Molnar replied, "I continue–I make that Motion to terminate the Chief for cause. Immediately."

116. The Motion to terminate Chief Medeiros was unanimously approved by all six Council members present; President Fry was absent.

117. On November 18, 2015, Chief Medeiros submitted to Springdale, his doctor's note confirming the information about his restriction from returning to work and recommending he continue therapeutic rest. **Exhibit 18.**

118. By letter dated November 20, 2015, Springdale notified Chief Medeiros that he was terminated, based on Council allegedly "revist(ing) and reconsider(ing)" the previously-rejected charges related to the Chief's use of authorized leave. **Exhibit 19.**

119. On November 24, 2015, Chief Medeiros filed a second Charge with the EEOC at docket number 533-2016-00262, and cross-filed a Complaint with the PHRC. **Exhibit 20.**

120. On December 3, 2015, Springdale failed and refused to disburse $3,819.18 in earned, unused vacation pay as part of the Chief's final pay, and on December 4, 2105, Chief Medeiros made a written demand for payment of these wages. **Exhibit 21**.

121. Springdale ignored the Chief's written demand for payment of his earned, unused vacation pay, and failed and refused to pay these wages on the next regularly scheduled payday, and similarly ignored an additional written demand on December 31, 2015, which also noted the Chief had not been provided any notice concerning the disbursement of his pension funds. **Exhibit 22.**

122. The Borough owes Chief Medeiros additional interest, penalties and attorney's fees for its failure to pay all wages when due or upon demand, pursuant to the Pennsylvania Wage Payment and Collection Law.

123. Chief Medeiros continued to be examined and to treat with his doctors, and informed Springdale he was released to return to work on January 12, 2016. **Exhibit 23.**

124. Springdale did not recall Chief Medeiros to work after he satisfied all three conditions precedent to his reinstatement.

125. Chief Medeiros filed a claim for unemployment compensation benefits, which Springdale opposed, and which claim was granted by the Commonwealth.

126. Springdale appealed the grant of unemployment compensation benefits and an evidentiary hearing was conducted before an unemployment compensation referee on February 10 and March 8, 2016.

127. At the unemployment hearing, the following individuals testified under oath: Mayor Lloyd, Borough Secretary Kimberly McAfoose, former Borough Council member John Molnar, former Borough Council member Eugene Polsinelli, Jeffrey Anzovino, and Chief Medeiros.

128. The unemployment compensation referee's decision again concluded that Chief Medeiros did not engage in any willful misconduct, and therefore was terminated, "without cause."

129. The Borough did not appeal this second adverse decision to the Unemployment Compensation Board of Review and it became final.

130. On April 22, 2016, Chief Medeiros formally demanded payment of the $78,000.00 he is owed pursuant to his contract with the Borough under "The Borough Agrees To" term at Page 4, Paragraph "P," which provides,  "Provide the Chief with a year of base severance pay in the event of termination or dismissal without cause." **Exhibit 24.**

131. The Borough did not respond to the April 22, 2016 demand, and has failed and refused to pay Chief Medeiros the amount he is due under the contract for his termination without cause.

132. Springdale's actions against Chief Medeiros in violations of the law were willful.

133. As the direct, proximate and foreseeable result of Springdale's unlawful acts, Plaintiff has suffered and will continue to suffer the loss of valuable wages and benefits, personal property, future employment opportunities, as well as emotional distress, embarrassment and humiliation.

134. The U.S. Department of Justice issued two Notices of Right to Sue upon request dated June 9, 2016, which were received on June 13th and 14th, 2016. **Exhibit 25.**

135. This suit is filed within ninety days of receipt of the Notices of Right to Sue.

## V. COUNTS

### Count 1: Breach of Contract - Pennsylvania Common Law

136. Paragraphs 1-135 are incorporated herein as if set forth in their entirety.

137. Springdale's failure to pay Chief Medeiros one year of base salary is in breach of its obligations to Chief Medeiros under the Springdale Employment Contract.

### Count 2: Pennsylvania Wage Payment and Collection Law

138. Paragraphs 1-137 are incorporated herein as if set forth in their entirety.

139.  Springdale failed and refused to pay Chief Medeiros his earned wages when due, and/or upon demand, in violation of the PWPCL.

**Count 3: Fair Labor Standards Act (FLSA) Misclassification and Failure to Pay Overtime**

140.   Paragraphs 1-139 are incorporated herein as if set forth in their entirety.

141.  Springdale willfully misclassified Chief Medeiros as exempt under the FLSA and paid him only a salary of $76,700.00, despite its knowledge that the majority of his work hours were regularly spent performing patrol and other non-managerial duties.

142. Springdale willfully caused or suffered Chief Medeiros regularly to work well in excess of forty hours per week without paying him compensation for overtime as required by law.

**Count 4: Title VII Retaliation**

143. Paragraphs 1-142 are incorporated herein as if set forth in their entirety.

144. Springdale discriminated against Chief Medeiros in his terms, conditions, rights and privileges of employment because he opposed discrimination under Title VII of the Civil Rights Act of 1964 as amended, and because he participated in filing a Charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC).

**Count 5: Pennsylvania Human Relations Act (PHRA) Retaliation**

145. Paragraphs 1-144 are incorporated herein as if set forth in their entirety.

146. Springdale discriminated against Chief Medeiros in his terms, conditions, rights and privileges of employment because he opposed discrimination under the PHRA and because he participated in cross-filing a Complaint of discrimination with the Pennsylvania Human Relations Commission.

**Count 6: Americans With Disabilities Act (ADA) and PHRA Disability Discrimination**

147. Paragraphs 1-146 are incorporated herein as if set forth in their entirety.

148. Chief Medeiros is a qualified individual with a disability within the meaning of the ADA and PHRA, because during his employment with Springdale he suffered from a physical and/or mental impairment which substantially limited one or more major life activities and which was not both transitory and minor, he had a record of such disability, and/or he was regarded as disabled by Springdale.

149. Chief Medeiros was harassed, segregated, and terminated because of his disability status.

### Count 7: Rehabilitation Act  Discrimination

150. Paragraphs 1-149 are incorporated herein as if set forth in their entirety.

151. Chief Medeiros is a qualified individual with a disability within the meaning of the Rehabilitation Act, because during his employment with Springdale he suffered from a physical and/or mental impairment which substantially limited one or more major life activities and which was not both transitory and minor, he had a record of such disability, and/or he was regarded as disabled by Springdale (i.e., because of his "disability status").

152. Chief Medeiros was harassed, segregated, and terminated because of his disability status.

### Count 8: Americans With Disabilities Act (ADA) Retaliation

153. Paragraphs 1-147 are incorporated herein as if set forth in their entirety.

154. Springdale discriminated against Chief Medeiros in his terms, conditions, rights and privileges of employment because he opposed discrimination under the ADA and because he participated in filing a Charge of discrimination under the ADA with the EEOC.

**Count 9: Rehabilitation Act Retaliation**

155. Paragraphs 1-154 are incorporated herein as if set forth in their entirety.

156. Springdale discriminated against Chief Medeiros in his terms, conditions, rights and privileges of employment because he opposed discrimination under the Rehabilitation Act.

**Count 10: U.S. Constitution, Amendment I & 42 U.S.C. §1983**

157. Paragraphs 1-156 are incorporated herein as if set forth in their entirety.

158. Springdale deprived Chief Medeiros of his property interest in his continued employment, because of his exercise of his First Amendment right to petition the government for redress of his grievances by filing Charges with the EEOC and PHRC, and by filing a worker's compensation claim, and because of his political affiliation with Mayor Lloyd.

**Count 11: U.S. Constitution Amendment XIV & 42 U.S.C. §1983**

159. Paragraphs 1-158 are incorporated herein as if set forth in their entirety.

160. Springdale deprived Chief Medeiros of his right to Due Process under the law, when it terminated him without providing any notice or opportunity to be heard.

**Count 12: Pennsylvania Whistleblower Law**

161. Paragraphs 1-160 are incorporated herein as if set forth in their entirety.

29

162. Springdale harassed, suspended, and terminated Chief Medeiros because of his good faith reports of wrongdoing or waste.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants for:

a.    Full back pay and benefits,

b.    Full front pay and benefits,

c.    Pre- and post-judgment interest,

d.    An amount equal to Plaintiff's past and future lost wages and benefits as liquidated damages,

e.    Compensatory damages,

f.    Reasonable attorney fees and costs of suit,

g.    An additional payment in an amount necessary to offset the adverse tax consequences of receiving the damages award in a lump sum, in order to effectuate the remedial purposes of the statutes,

h.    Penalties as provided by applicable statutes, and,

I.    Such other legal and equitable relief as the Court finds just and proper.

**A jury trial is demanded as to all matters triable to a jury.**

Filed: September 2, 2016                Respectfully submitted,

30

s/Christian Bagin

Christian Bagin

PA ID # 85511

WIENAND & BAGIN

100 First Avenue, Suite 1010

Pittsburgh, PA 15222

PH: 412-281-1110

FAX: 412-281-8481

Christian@wienandandbagin.com